

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-18-00122-CR

———————————————

DANIEL ANDREW RALICKI, Appellant

V.

THE STATE OF TEXAS

On Appeal from County Court at Law No. 1
Wichita County, Texas
Trial Court No. 68873-E

Before Sudderth, C.J.; Kerr and Bassel, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

### I. INTRODUCTION

A jury convicted Appellant Daniel Andrew Ralicki of one count of possession of less than two ounces of marihuana—a Class B misdemeanor. *See* Tex. Health & Safety Code Ann. § 481.121(a), (b)(1). The trial court assessed his punishment at three days in the county jail, fined him $500, and rendered judgment accordingly. Appellant raises two points, challenging the denial of his motion to suppress and the trial court's denial of his jury instruction regarding the exclusion of evidence. We affirm.

### II. BACKGROUND

#### A. Police Respond to a Report of Gunshots at Appellant's Residence, Where Appellant is Detained, Frisked, and Discovered to be in Possession of Less than Two Ounces of Marihuana

Shortly before 11 p.m. on January 28, 2015, officers of the Wichita Falls Police Department (WFPD) were dispatched to Appellant's residence after receiving a report of gunshots fired. Officer Jacob Blashill and Sergeant Miller of WFPD were the first officers to arrive at the scene.

Officer Blashill observed one person, later identified as Appellant, in front of the residence. When the officers approached Appellant, he informed them that there was an armed man, later identified as Appellant's brother Raymond, who was behind a truck in the driveway. Officer Blashill testified that he and Sergeant Miller drew their guns and commanded Raymond to drop his weapon (an AK-47-style rifle) and

2

step into the yard and that Raymond complied with their commands. The officers then detained Appellant and Raymond in handcuffs.

Appellant and Raymond informed the officers that they had seen a man wearing a ghillie suit[1] and that Raymond shot at him through the wall. When Officer Blashill asked Appellant why he thought someone in a ghillie suit would be hiding outside of his house, Appellant stated that Raymond was wanted by the cartel and the CIA. Both Appellant and Raymond told Officer Blashill that there were drones circling over the house, but Officer Blashill testified that neither he nor any other officers on the scene saw drones.

Another WFPD officer, Tyler Bohannon, subsequently arrived at the scene where he observed Appellant and Raymond being held at gunpoint. He assisted the officers in attempting to locate the man in the ghillie suit, but no such man was ever found. Officer Blashill found three bullet holes under one of the windows and three shell casings, which confirmed Appellant's story that Raymond had fired shots through the wall.

Officer Bohannon, along with other officers, performed a sweep of the house. During the sweep they observed several other guns in the house and another gun on the front porch.

---

[1]A ghillie suit is a type of camouflage clothing that resembles the background environment, often made to look like twigs, leaves, and foliage.

3

Appellant and Raymond were secured in patrol cars, with Appellant being placed in Officer Bohannon's patrol car. Because Officer Bohannon had not frisked Appellant and was unaware if Appellant had already been frisked for weapons, he had Appellant step out of his patrol car to be frisked. During the frisk, Officer Bohannon felt a plastic bag. He asked Appellant what it was, and Appellant informed Officer Bohannon that it was his "reefer," a street term for marihuana. At that point, Officer Bohannon removed a plastic baggie with "green leafy contents." Later testing of the contents of the baggie revealed a positive test for the presence of marihuana.

Because the officers believed Appellant was suffering from mental illness and that he posed a substantial risk to himself and others, Officer Blashill filled out an application for emergency detention and transported him to the state hospital.

The State filed an information against Appellant, charging him with the offense of possession of less than two ounces of marihuana. Tex. Health & Safety Code Ann. § 481.121(a).

## B. The Motion to Suppress Hearing

Appellant filed two motions to suppress. Officer Blashill, Officer Bohannon, and Appellant testified at the hearing.

Officer Blashill testified that he did not frisk Appellant when Appellant was initially detained on the front lawn. Officer Blashill explained that because of the circumstances at the scene—that Appellant and Raymond claimed to have seen a man in a ghillie suit outside of their window, that Raymond had fired shots through the

4

wall, that they had access to a significant number of firearms, and that they were fearful of the cartel and CIA—the officers determined that Appellant and Raymond were suffering from mental illness, so Officer Blashill transported Appellant to the state hospital:

Q Now, at some point, did you make a determination as to the mental state of the defendant?

A Yes, sir.

Q And what was that assessment you made?

A Based on everything we had seen, we believed that both subjects were not clear or in their normal state of mind and transferred them to the state hospital for treatment.

Q So did you believe that the defendant had a mental illness?

A At the time, yes.

Q Did you believe that if he were not taken into custody, he would be a substantial risk of harm to himself or others?

A Absolutely.

Q And do you believe there was sufficient time to get an arrest warrant?

A I did not.

The officers performed a sweep of the house, and Appellant was placed in Bohannon's patrol car. Officer Bohannon testified that, pursuant to another sergeant's instruction and his own uncertainty as to whether Appellant had been frisked for weapons, he had Appellant step out of the patrol car to frisk him. Officer Bohannon stated that, although he could not recall a specific point when the frisk

5

occurred, he believed that it was prior to the decision to transport Appellant to the state hospital. Officer Bohannon testified that, in light of the nature of the dispatch, his reason for conducting the frisk was to make sure Appellant did not have any weapons or something that could be used to harm him.

Officer Bohannon testified in detail about how the frisk led to the detection of the plastic baggie, which Appellant identified as containing marihuana:

A During the frisk, I did find --

Q I'm sorry. The frisk, yes.

A I felt in his pocket what I believed to be contraband.

Q And why did you believe it to be contraband?

A I had frisked other people, and with my experience you can typically determine that something is possibly contraband if it feels a specific way.

Q And when you felt this, what did you say?

A I asked him what it was.

Q And how did he respond?

A He said it's his reefer.

Q And what did you take that to mean?

A I know that's a street name for [marihuana], so I took him at his word.

Q And what did you do next?

A I retrieved the [marihuana].

Q Okay.

A  Suspected [marihuana].

On cross-examination, Officer Bohannon clarified that while his pat-down caused him to believe an item in Appellant's pocket was contraband, it was Appellant himself who identified the contents of the baggie as his "reefer" before Officer Bohannon pulled it out:

Q  Well, I guess during this pat down, we'll call it, you said that you felt what you believed to be a small [baggie] of possible [marihuana], right?

A  Yes.

Q  And so at that point, you're thinking to yourself it's possibly contraband?

A  Yes.

Q  And based upon the nature of how you demonstrated this pat down, I'm assuming -- well, you're saying that just by patting him down, you were able to determine that he had contraband in his pocket?

A  Yes, what I believed to be contraband?

Q  You didn't know.

A  I believed -- I mean it was apparent to me with my training and experience that I sincerely believed it to be contraband.

Q  You had to fish it out of his pocket to determine that it was contraband, correct?

A  No, I just asked him.

Q  You did ask him what it was, right?

A  Right.

Q  Because you didn't yet know?

A  Could you repeat the --

Q  The reason you asked him what was in his pocket is because you didn't know what was in his pocket?

A  Oh, no.  The reason I asked him what was in his pocket was because that was something I typically did any time I patted somebody down so they would have the opportunity to tell me before I reached in there.

Appellant testified that although he did own a firearm, it was inside of his house when the police arrived and that he was unarmed.  He stated that when the police arrived, he was patted down and placed in handcuffs and that nothing was found on his person at that time:

Q  So the first pat down occurred pretty quickly after the officers arrived on scene?

A  Yes, sir.

Q  Okay.  Describe that pat down.

A  First, he came over to me, told me that they had secure[d] the situation, put me in handcuffs, put me on the ground and he frisked me, put his hands in my pockets, frisked my legs, my sides, underneath, everything.

Q  At that time, was anything found on your person?

A  No, sir.

Appellant further testified that the police had him wait on the front lawn for "[a]bout an hour" before he was eventually placed in the back of an officer's patrol car.

8

Appellant then stated that he was removed from the patrol car and patted down a second time by a different officer:

Q  So you were patted down a second time?

A  Yes.

Q  And this was the same or different officer?

A  Different officer.

Q  Okay.  Where were you when this pat down was initiated?

A  They took me out of the police car and [Officer Bohannon] is the one that patted me down.

Appellant stated that when Officer Bohannon conducted the second pat down, he "put his hands in my pocket, and he came out with something in his hand." Appellant theorized that the marihuana discovered during the pat-down was planted:

Q  (By [prosecutor]) Mr. Ralicki, you will say there was an object in your pocket?

A  No.  He pulled something -- he -- his hand went in my pocket; his hand came out; there was something in his hand.

Q  So before --

A  He says he pulled it out of my pocket.  There was nothing in my pocket.

Q  So he planted that evidence in your pocket?

A  I don't know where it came from.

Q  But you're saying that it wasn't there before the frisk?

A  Yes, I am.

9

The trial court denied the motion to suppress. Subsequently, the trial court made findings of fact and conclusions of law, which included conclusions that Officers Blashill and Bohannon were credible, that Appellant was not credible, and that Appellant had exhibited signs of severe emotional distress and mental deterioration.

## C. The Trial and Charge Conference

Trial commenced immediately after the suppression hearing. The State's only witnesses were Officers Bohannon and Blashill. Officer Bohannon testified that he only frisked Appellant once and that he did not know whether any other officer had already frisked Appellant. Officer Blashill testified that he did not recall if he frisked Appellant when he and Sergeant Miller initially detained Appellant and Raymond. However, Officer Blashill testified unequivocally that he never searched Appellant:

> Q Okay. At any point in that night, did you conduct a frisk of this defendant?
>
> A I don't know if I did or not.
>
> Q At any point in this night, did you search this defendant?
>
> A I did not.

Officer Blashill acknowledged on cross-examination that although he did not remember if he frisked Appellant upon the initial detention, his training was so engrained to frisk someone for weapons when they are handcuffed that he could frisk someone he handcuffed without even realizing it:

Q  And so and a lot of these things you guys do when you show up on scene is very routine to you, right?

A  Yes, sir.

Q  It's practiced?

A  Right.

Q  All right.  So you guys do -- you're trained to hopefully do the right thing every time without thinking about it?

A  Yes, sir.

Q  So when you see somebody with a gun, you probably drew your gun without even thinking about it?

A  Right.

Q  Because your safety is first?

A  Yes.

Q  And when you cuff somebody, you might frisk them without thinking about it.  So might Sergeant Miller, correct?

A  Right.

Q  Because it's a standard part of somebody's got a gun on scene, right?

A  Right.

Q  And you put them in cuffs and you don't want anybody else -- you don't want any shots to be fired?

A  Right.

Q  You don't want anybody to be stabbed or anything like that, so you search those people for weapons?

A  Right.

Q As a routine?

A Right.

Q You just don't specifically remember if you did that in this case or not?

A I don't remember if I was the one that put handcuffs on either one of them.

Appellant did not testify at trial nor did he call any witnesses to testify.

During the jury charge conference, Appellant's trial counsel asked for and submitted a special charge under article 38.23 of the code of criminal procedure—Texas's statutory exclusionary rule. Tex. Code Crim. Proc. Ann. art. 38.23; *St. George v. State*, 197 S.W.3d 806, 824 (Tex. App.—Fort Worth 2006) (op. on reh'g) (explaining the purpose "of article 38.23 is to deter unlawful police conduct by precluding the use against the accused of evidence obtained by illegal police activity"), *aff'd*, 237 S.W.3d 720 (Tex. Crim. App. 2007). He stated that he was requesting the jury instruction because

> [t]here is a disputed issue as to whether or not there was a second frisk. We are relying on authority *Lippert v. State* and 38.23, obviously, and *Adams v. Williams*[,] 407 U.S. 143[,] and *Lippert v. State*[,] 664 S.W.2d 712. *Lippert* stands for the proposition that once the State -- once the police have searched the subject and found, searched a suspect and found no weapons. Excuse me, frisk. I should clarify frisked a suspect and found no weapons, the officer would have no valid reason to further invade the suspect's right to be free of intrusion absent probable cause for arrest.
>
> So that in combination with *Adams*, which says that "in reaching this conclusion, we reject respondent's argument that reasonable cause for a stop and frisk can only be based on the officer's personal

12

observations rather than on the information supplied by another person." . . .

So the combination of those two cases, we believe, one being a Court [o]f Criminal Appeals case and one being a U.S. Supreme Court Case, would say that a second frisk once a first frisk is done would be unlawful absent a material change in circumstances, which there weren't in this case. And we believe that those are controlling, that these cases are controlling, and would ask that that instruction be included as to the 38.23 exclusionary rule instruction.

In response, the prosecutor conceded that there was a disputed fact regarding the number of times Appellant was frisked but still argued that a second *Terry* frisk is not unreasonable per se and that the cases cited by Appellant for that proposition do not stand for such:

Yes, Your Honor. In regard to the *Terry* issue, I'll agree that there's a disputed issue of fact. However, the issue here is that the statement or the language suggested by the defense attorney that a second frisk is prohibited by law, the State contends that is an incorrect statement of the law and we tender to you *U.S. v. Howard*, which is the United States Court Of Appeals from the 7th Circuit. It just states that a second *Terry* frisk is not unreasonable and that the propriety of that frisk turns on whether the officer believed that at the moment he was a threat to his safety. And the statute that -- or the case that the defense tendered, *Lippert*, does not say that a second frisk is per se unconstitutional, but based upon the facts in that case was unconstitutional.

And for that reason, we'd ask that . . . instruction [number 1] not be allowed into the charge.

The trial court denied Appellant's request for a charge on the law concerning the exclusion of evidence under article 38.23.

13

The jury unanimously found Appellant guilty of possession of less than two ounces of marihuana, and the trial court sentenced him to three days in jail and a $500 fine. Appellant noticed this appeal.

### III. MOTION TO SUPPRESS

In his first point, Appellant contends that the trial court erred by denying his motion to suppress because the police unreasonably frisked him more than once—first, when they arrived at the scene, and second, when they removed him from the back of the patrol car—and because a warrantless search occurred during an invalid mental health commitment. The State responds that evidence at the suppression hearing supported that (1) Appellant was only frisked once, (2) Officer Bohannon had specific and articulable facts that taken together with rational inferences could lead a reasonably prudent person to conclude that Appellant might have a weapon, and (3) a search was justified under section 573.001(a) of the health and safety code because Appellant presented signs of mental illness and posed a substantial risk of serious harm to himself or others.

**A. Standard of Review**

We apply a bifurcated standard of review to a trial court's ruling on a motion to suppress evidence. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). In reviewing the trial court's decision, we do not engage in our own factual review. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *Best v. State*, 118 S.W.3d 857, 861 (Tex.

14

App.—Fort Worth 2003, no pet.). The trial judge is the sole trier of fact and judge of the witnesses' credibility and the weight to be given their testimony. *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007). Therefore, we defer almost totally to the trial court's rulings on (1) questions of historical fact, even if the trial court determined those facts on a basis other than evaluating credibility and demeanor, and (2) application-of-law-to-fact questions that turn on evaluating credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Montanez v. State*, 195 S.W.3d 101, 108–09 (Tex. Crim. App. 2006); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002). But when application-of-law-to-fact questions do not turn on the witnesses' credibility and demeanor, we review the trial court's rulings on those questions de novo. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson*, 68 S.W.3d at 652–53.

Stated another way, when reviewing the trial court's ruling on a suppression motion, we must view the evidence in the light most favorable to the ruling. *Wiede*, 214 S.W.3d at 24; *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). When the trial court makes explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those findings. *Kelly*, 204 S.W.3d at 818–19. We then review the trial court's legal ruling de novo unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling. *Id.* at 818.

Even if the trial court gave the wrong reason for its ruling, we must uphold the ruling if it is both supported by the record and correct under any applicable legal theory. *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003).

## B. Applicable Law

### 1. Unreasonable Search and Seizure Jurisprudence

The Fourth Amendment forbids unreasonable searches and seizures by government officials. U.S. Const. amend. IV; *Wiede*, 214 S.W.3d at 24. To suppress evidence because it was obtained by an alleged Fourth Amendment violation, the defendant bears the initial burden of producing evidence that rebuts the presumption of proper police conduct. *Amador*, 221 S.W.3d at 672; *see Young v. State*, 283 S.W.3d 854, 872 (Tex. Crim. App. 2009). A defendant satisfies this burden by establishing that a search or seizure occurred without a warrant. *Amador*, 221 S.W.3d at 672. Once the defendant has made this showing, the burden of proof shifts to the State, which must then establish that the search or seizure was conducted pursuant to a warrant or was reasonable. *Id.* at 672–73; *Torres v. State*, 182 S.W.3d 899, 902 (Tex. Crim. App. 2005); *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005).

Whether a search is reasonable is a question of law that we review de novo, measuring reasonableness by examining the totality of the circumstances. *Kothe v. State*, 152 S.W.3d 54, 62–63 (Tex. Crim. App. 2004). In the process we must balance the public interest served against the individual's right to be free from arbitrary detentions and intrusions. *Id.* at 63. A warrantless search is per se unreasonable

unless it falls within one of the "specifically defined and well established" exceptions to the warrant requirement. *McGee v. State*, 105 S.W.3d 609, 615 (Tex. Crim. App. 2003); *see Best*, 118 S.W.3d at 862.

### 2. *Terry* **Frisks**

A law enforcement officer who has lawfully detained a person for investigation may conduct a protective pat-down or frisk[2] (*Terry* frisk) of the detainee's outer clothing for weapons, even in the absence of probable cause, if the officer reasonably believes that the suspect is armed and dangerous. *Arizona v. Johnson*, 555 U.S. 323, 326–27, 129 S. Ct. 781, 784 (2009); *Terry v. Ohio*, 392 U.S. 1, 27, 88 S. Ct. 1868, 1883 (1968); *O'Hara v. State*, 27 S.W.3d 548, 551 (Tex. Crim. App. 2000); *Davis v. State*, 829 S.W.2d 218, 220–21 (Tex. Crim. App. 1992) (op. on reh'g). "The purpose of a limited search after [an] investigatory stop is not to discover evidence of a crime, but to allow the peace officer to pursue investigation without fear of violence." *Wood v. State*, 515 S.W.2d 300, 306 (Tex. Crim. App. 1974).

To justify a frisk, the officer need not be absolutely certain a person is armed; the question is whether a reasonably prudent man in the officer's circumstances would be warranted in the belief that his safety or that of others was in danger. *Terry*, 392 U.S. at 27, 88 S. Ct. at 1883; *O'Hara,* 27 S.W.3d at 551–52; *Elliot v. State*, 548 S.W.3d 121, 127 (Tex. App.—Fort Worth 2018, pet. ref'd) ("A pat-down search for weapons

---

[2]*Frisk*, Black's Law Dictionary (10th ed. 2014) ("A pat-down search to discover a concealed weapon. — Also termed *pat-down*.").

without a warrant is justified only when specific and articulable facts, when taken together with rational inferences from those facts, reasonably could lead to the conclusion that the suspect might possess a weapon.").

In assessing reasonableness, "due weight" must be given to the facts and inferences viewed "in light of [the officer's] experience." *United States v. Michelletti*, 13 F.3d 838, 841 (5th Cir. 1994) (quoting *Terry*, 392 U.S. at 27, 88 S. Ct. at 1883). In a reviewing analysis, we must attempt to put ourselves in the shoes of a reasonable police officer facing the particular situation and assess the likelihood of danger in that context. *See United States v. Rideau*, 969 F.2d 1572, 1574 (5th Cir. 1992) (op. on reh'g).

In the course of a *Terry* frisk, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *Minnesota v. Dickerson*, 508 U.S. 366, 375, 113 S. Ct. 2130, 2136–37 (1993); *Balentine v. State*, 71 S.W.3d 763, 770 (Tex. Crim. App. 2002).

## C. Analysis

At the suppression hearing, the State stipulated that the marihuana was obtained as a result of a warrantless search. Therefore, the issue is whether Officer Bohannon's frisk that led to the discovery of the marihuana was reasonable given the particular circumstances, likelihood of danger, and Officer Bohannon's experience.

As an initial matter, the testimony on whether Officer Blashill initially frisked Appellant for weapons was conflicting: At the suppression hearing, Officer Blashill

testified that he did not frisk Appellant, but at trial Blashill testified that he could not remember whether he had frisked Appellant.[3] Appellant testified that Officer Blashill did frisk him, and Officer Bohannon testified that when he frisked Appellant, he believed that Appellant had not previously been frisked.

In its findings, the trial court concluded that Appellant's testimony was not credible and that Officers Blashill and Bohannon's testimony was credible. Thus, the only evidence at the suppression hearing that Appellant was frisked more than once was Appellant's own testimony, which the trial court chose not to believe. *See State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000) ("In a motion to suppress hearing, the trial court is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. Accordingly, the judge may believe or disbelieve all or any part of a witness's testimony."); *Westbrook v. State*, No. 2-07-455-CR, 2008 WL 5672533, at *5 (Tex. App.—Fort Worth Feb. 26, 2009, pet. ref'd) (mem. op. on reh'g, not designated for publication) ("Where, as here, the factfinder weighs the evidence based on credibility, the factfinder may choose to believe some testimony and to disbelieve other testimony.").

Because the trial judge at a suppression hearing is the sole judge of witnesses' credibility and because Appellant has provided no compelling reason to second-guess

---

[3]In addition to the testimony adduced at a pretrial suppression hearing, we may also consider trial testimony when parties relitigate a suppression issue at trial on the merits. *See Gutierrez v. State*, 221 S.W.3d 680, 687 (Tex. Crim. App. 2007).

the trial judge's credibility determination, we decline to do so. *See Rodriguez v. State*, No. 02-17-00283-CR, 2018 WL 2343663, at *5 (Tex. App.—Fort Worth May 24, 2018, no pet.) (mem. op., not designated for publication) (declining to "second-guess the trial court's acceptance of Officer McMeans's testimony and its rejection of contradicting testimony offered by Rodriguez and Garza" at suppression hearing); *McCowan v. State*, Nos. 02-12-00156-CR, 02-12-00157-CR, 2013 WL 4028186, at *2 (Tex. App.—Fort Worth Aug. 8, 2013, no pet.) (mem. op., not designated for publication) ("[T]he trial court was uniquely positioned to determine the credibility of the witnesses. We will not second guess these determinations."). Accordingly, the trial court did not err in determining that Appellant was only frisked once.

But even assuming *arguendo* that Appellant was frisked twice, two separate *Terry* frisks by two different officers is not unreasonable as a matter of law. In *United States v. Howard*, the Seventh Circuit Court of Appeals addressed a case in which the defendant was detained and frisked by one officer and then frisked a second time by a different officer who stated he was unaware that the first frisk had occurred. 729 F.3d 655, 657 (7th Cir. 2013). The second frisk resulted in the discovery of a sandwich bag that contained half an ounce of cocaine. *Id.* at 657–58. The defendant argued that "it was unreasonable for [the second officer] to frisk him because [he] knew that [the first officer] had already frisked him." *Id.* at 662.

After mentioning that the district court actually made a finding that the second officer had not known about the prior frisk, *Howard* then affirmed that "even if [that]

20

factual finding had been erroneous, it is not necessarily unreasonable for police to frisk a person more than once when he has been seized on the rapidly evolving scene of police activity." *Id.* Although *Howard* declined to "decide conclusively" whether the second search exceeded the constitutional limits on *Terry* frisks, it affirmed that "[e]ven if [the second officer] had known that [the first officer] had given [the defendant] a brief frisk, it would have been reasonable to frisk him a second time as long as he had a credible reason to believe that [the first officer] might have missed a dangerous weapon." *Id.* at 662–63.

We agree with the reasoning in *Howard* and apply it here. Thus, determining whether Officer Bohannon's frisk was reasonable does not depend on whether Officer Blashill had already frisked Appellant, but whether it was reasonable for Officer Bohannon to conduct his specific frisk based on the particular circumstances on the scene, the likelihood of danger, and his experience.

Given the particular circumstances of the call that Officer Bohannon responded to—which included shots fired, bullet holes in the wall, a missing man in a ghillie suit, the discovery of several other weapons in the house and on the front porch, Raymond carrying an AK-47-style weapon, and Appellant's statements about the cartel, CIA, and drones circling—and that Appellant had been placed in the back of Officer Bohannon's patrol car without Officer Bohannon having any knowledge of whether Appellant had already been frisked, we conclude that it was reasonable for

Officer Bohannon to frisk Appellant for weapons out of concern for Bohannon's own safety. *See id.*; *Balentine*, 71 S.W.3d at 770.

Therefore, we overrule Appellant's first point.[4]

## IV. JURY CHARGE

In his second point, Appellant argues that the trial court erred in not submitting his requested jury instruction regarding code of criminal procedure article 38.23 because "it is undisputed that Appellant raised a disputed fact issue about the number of times that officers frisked him. The State even conceded this." He further contends that he raised a fact issue regarding his state of mind and the evidentiary sufficiency of the evidence supporting the determination to take Appellant into protective custody. The State argues that nothing in the trial record supports that multiple frisks occurred because the only testimony concerning multiple frisks was from Appellant at the motion to suppress hearing, whereas Appellant chose not to testify at trial. The State does not respond to Appellant's argument regarding protective custody.

### A. Article 38.23

Article 38.23 of the code of criminal procedure mandates the suppression of illegally obtained evidence. Tex. Code Crim. Proc. Ann. art. 38.23; *Jenschke v. State*,

---

[4]Because we affirm the denial of Appellant's motion to suppress on this basis, we need not address whether Appellant was searched during an invalid mental health commitment. *See* Tex. R. App. P. 47.1. We note, however, that the record supports that Officer Bohannon's frisk and the discovery of marihuana occurred prior to the decision to transport Appellant to the state hospital.

147 S.W.3d 398, 400 (Tex. Crim. App. 2004). Even if the defendant fails to object to the admission of the illegally obtained evidence at the time it is offered, the "same defendant may still request and receive a jury instruction under Article 38.23 if the evidence raises a contested factual issue that is material to the lawfulness of obtaining the evidence." *Holmes v. State*, 248 S.W.3d 194, 196 (Tex. Crim. App. 2008).

To be entitled to an article 38.23(a) instruction, the defendant must show that (1) a party raised an issue of historical fact in front of the jury, (2) a party contested the fact by affirmative evidence at trial, and (3) the fact is material to the constitutional or statutory violation that the defendant has identified as rendering the particular evidence inadmissible. *Robinson v. State*, 377 S.W.3d 712, 719 (Tex. Crim. App. 2013).

With regard to the first requirement, the court of criminal appeals has affirmed that "[t]here must be a genuine dispute about a material fact," and "[i]f there is no disputed factual issue, the legality of the conduct is determined by the trial judge alone, as a question of law." *Madden v. State*, 242 S.W.3d 504, 510 (Tex. Crim. App. 2007). Thus, a defendant is not entitled to an article 38.23 instruction if there was "no factual dispute" about the lawfulness of the challenged conduct. *Id.*

**B. Analysis**

It appears from our review of the charge conference that while the State conceded that there was a disputed issue of fact regarding the number of frisks, it maintained that "the issue here is that the statement or the language suggested by the defense attorney that a second frisk is prohibited by law, the State contends that is an

23

incorrect statement of the law." Thus, the State argued that a "second *Terry* frisk is not unreasonable and that the propriety of that frisk turns on whether the officer believed that at the moment he was a threat to his safety. And the statute that -- or the case that the defense tendered . . . does not say that a second frisk is per se unconstitutional." That is, there may have been a disputed fact regarding the number of times Appellant was frisked, but the fact was not material because more than one *Terry* frisk is not unreasonable per se.

As explained above, more than one *Terry* frisk is not unreasonable per se. The propriety of Officer Bohannon's frisk is not based solely whether Appellant had already been frisked or even if Officer Bohannon knew that Appellant had already been frisked, but whether it was reasonable at the time Officer Bohannon conducted the *Terry* frisk in dispute. *Howard*, 729 F.3d at 662; *Balentine*, 71 S.W.3d at 770. We have already held that Officer Bohannon's frisk was reasonable.

Therefore, although there may have been a disputed fact about the number of frisks that Appellant was subjected to, he has failed to show that the disputed fact is material.[5] *See Howard*, 729 F.3d at 662; *Balentine*, 71 S.W.3d at 770. Thus, the trial court did not err by failing to submit the instruction.

---

[5]*Lippert v. State*, the case relied upon by Appellant, is distinguishable. 664 S.W.2d 712 (Tex. Crim. App. 1984). In *Lippert*, the court of criminal appeals held that if "in the course of a pat-down frisk the officer satisfies himself that the suspect has no weapons, the officer has no valid reason to further invade the suspect's right to be free of police intrusion absent probable cause to arrest." *Id.* at 721. Here, even assuming *arguendo* that Officer Blashill initially frisked Appellant, the ostensible second

Accordingly, we overrule Appellant's second point.

## V. CONCLUSION

Having overruled Appellant's two points, we affirm the trial court's judgment.

/s/ Dabney Bassel

Dabney Bassel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: January 24, 2019

---

frisk was conducted by Officer Bohannon—a different officer—who testified that he had no knowledge if Appellant had already been frisked.